**SCOTT MEDICAL SUPPLY COMPANY, INC., Plaintiff-Appellee-Cross Appellant,**

v.

**BEDSOLE SURGICAL SUPPLIES, INC., and Donald W. Edwards Company, Inc., Defendants-Appellants-Cross Appellees.**

No. 73-1576.

United States Court of Appeals, Fifth Circuit.

Jan. 31, 1974.

Louis E. Braswell, Mobile, Ala., for Bedsole.

Geary A. Gaston, David W. Green, Mobile, Ala., for Edwards.

John L. Lawler, M. A. Marsal, Irvin J. Langford, Mobile, Ala., for plaintiff-appellee.

Before TUTTLE, DYER and MORGAN, Circuit Judges.

DYER, Circuit Judge:

■ This is an appeal from a judgment of the district court entered upon a jury finding that Bedsole Surgical Supply and the Donald Edwards Company engaged in a conspiracy in restraint of trade proscribed by section 1 of the Sherman Act, 15 U.S.C.A. § 1. Upon the jury's return of a verdict against the defendants for $10,500.00, the district court ordered a remittitur, trebled the reduced damages, and awarded substantial attorneys' fees. We have determined that there was insufficient evidence of the alleged conspiracy to take the case to the jury. Accordingly, we reverse.

Scott Medical Supply Company, a Mobile, Alabama, hospital supplies dealer, instituted this action alleging that Bedsole, a retail medical products supplier who was a direct competitor of Scott's, and the Donald Edwards Company, a manufacturers' representative of firms producing medical supplies, conspired to deprive Scott of certain medical products which Scott had theretofore been marketing or desired to market in the Mobile area.

Because the sufficiency of the evidence of unlawful conspiracy is the principal point in issue on appeal, a detailed factual examination of the very special-

ized hospital supplies industry is required. Scott Medical relies upon three instances of terminations or refusals to deal by manufacturers of various hospital supplies as showing the successful conspiracy by Bedsole and Edwards to deprive Scott of wares vital to its economic existence. These terminations or refusals to deal involve the Pioneer Rubber Company, a manufacturer of surgical gloves; the American Safety Razor Company, a surgical blades firm which in 1968 expanded into the sutures industry by acquiring the Lukens Sutures Company; and Shampaine Industries, which manufactures specialty tables designed for hospital usage. Several incidents of alleged misconduct prior to 1966 were developed at trial for the purpose of showing the unlawful intent allegedly harbored by Bedsole and Edwards.

There are two common, but independent, threads woven throughout most of the instances relied on by Scott Medical as supporting imposition of antitrust liability. First, Scott maintains that Bedsole, its direct and larger competitor in retailing hospital supplies in the Mobile area, exerted pressure on and then conspired with Edwards, the representative of various manufacturers of hospital supplies, to induce those manufacturers represented by Edwards to refrain from dealing with Scott. According to Scott, Edwards cooperated and acquiesced in Bedsole's unlawful designs due to Bedsole's threats to terminate its relationship with Edwards if the latter continued to deal with Scott, even though the two alleged co-conspirators were non-competitors, situated as they were on different tiers of the distribution network. Second, in other instances, Scott argues that the facts demonstrate an evil animus by Bedsole toward the former's enterprise, even though no actionable conspiracy between

Edwards and Scott is evident from these transactions.

## LUKENS SUTURES

Prior to 1968, Scott Medical had engaged in sporadic sales of sutures produced by the Lukens Company of St. Louis, Missouri. In marketing its products, the Lukens firm employed its own sales force and thus did not require the services of an independent manufacturer's representative. As a result, the Donald Edwards Company had no association with Lukens, and Scott obtained its sutures directly from the company without resort to any intermediary. This situation prevailed until 1968, when Lukens underwent a major reorganization. During that year, the American Safety Razor Company (ASR), a firm which manufactured surgical blades, acquired the small Lukens company as part of an expansion program. ASR, which was represented by Edwards and whose surgical blades were being retailed by Bedsole, continued the pre-existing Scott-Lukens liaison by entering into a dealership agreement with Scott in October, 1968. This relationship continued for over a year until December, 1969, when ASR decided to terminate Scott's dealership as part of a nationwide cut-back by ASR from 1,000 to 600 dealers. Bedsole, on the other hand, was retained as an ASR dealer, even though it was inactive in marketing the newly-acquired sutures line.[1]

Scott, pointing out the incongruity in ASR's terminating an active and successful dealer while retaining a dealer in the same geographical area who was disinterested and unsuccessful in selling the manufacturer's product, urges that ASR's termination of Scott was induced by Edwards, ASR's manufacturers' representative, as a result of the unlawful Bedsole-Edwards conspiracy. There was disputed evidence that at an ASR meet-

---

1. Bedsole was, however, selling a different line of sutures to its customers. It primarily marketed Ethicon sutures, which was the leading line of sutures, far exceeding the modest market share enjoyed by Lukens.

ing in Dallas in 1968, after ASR acquired Lukens,[2] an employee of the Donald Edwards Company suggested to ASR officials that Scott's dealership be terminated in view of the superior performance and cooperation of Bedsole in dispensing ASR blades. Assuming that the suggestion was made and that the meeting occurred after Scott had been awarded an ASR dealership in October, 1968, we are persuaded that this evidence, albeit suggestive of suspicions of wrongdoing, does not constitute substantial evidence, particularly when viewed in the light of uncontradicted testimony to the contrary. Boeing Company v. Shipman, 5 Cir. 1969, 411 F.2d 365.

First, for over a year after the Dallas meeting, Scott continued to sell, and ASR, represented by Edwards, continued to supply Lukens sutures to Scott. No actions or suggestions on the part of either Edwards or Bedsole with respect to Scott's dealership are alleged to have occurred subsequent to the 1968 Dallas meeting. Importantly, during this interval, Scott's success in retailing Lukens sutures waned markedly from $15,000.00 in gross sales during 1968 to approximately $3,000.00 in 1969. Additionally, ASR, which was experiencing considerable production difficulties with its new sutures line, decided to eliminate 400 of its 1000 dealers. In this decision-making process, it was uncontradicted that the decision to terminate Scott was made on the basis of objective criteria promulgated by ASR which Scott failed to meet, and that no one at either Bedsole or Edwards had any conversation with or otherwise suggested to ASR officials that Scott's dealership be terminated.

Aside from this testimony by ASR officials, it appears that ASR was primarily engaged in the manufacture of surgical blades, which Bedsole, and not Scott, was successfully marketing even before 1968. Indeed, Bedsole enjoyed a long-standing relationship with ASR. In contrast, the acquisition of Lukens Sutures by ASR in 1968 was the first contact Scott, which had theretofore been marketing the Lukens line, but not ASR blades, had with ASR. Upon acquiring Lukens, ASR promptly experienced sterilization difficulties in packaging the sutures, which exacerbated problems already besetting a product which had theretofore captured a mere two percent of the sutures market. Lukens sutures were, in short, comparatively poor sellers, and ASR subsequently recognized Lukens, an ancillary enterprise for a razor company, as an unsatisfactory venture and, accordingly, sold out its interest in Lukens completely. Since the evidence amply demonstrates ASR's relative lack of concern with Lukens sutures, we can hardly fault ASR for terminating a dealer who was marketing an ancillary and troublesome line produced by the company and retaining instead a dealer, Bedsole, who was highly successful over a lengthy period in selling the company's primary lines. Furthermore, the glitter of Scott's success even with respect to sutures, a factor on which Scott understandably relies heavily, is tarnished upon examining the comparative sales figures for 1968 and 1969, with the substantial sales decline experienced in the latter year.

We are therefore left only with the remark of an Edwards employee at the ASR meeting in Dallas as evidence of an Edwards-Bedsole conspiracy to deprive

---

2. The exact date of the Dallas meeting is in dispute. Scott maintains that the meeting occurred in late 1968, after Scott and ASR had entered into the October dealership agreement. Bedsole urges that the meeting occurred sometime during the summer of 1968 and thus before the October accord was reached. The importance of the relative dates of the Dallas meeting and the October agreement is due, of course, to the fact that if the suggestion for ASR not to deal with Scott was made *before* ASR entered into a formal dealership agreement with Scott Medical, then the suggestion had absolutely no impact on the ASR decision. Since Scott contends that the Bedsole-Edwards conspiracy resulted in ASR's termination of Scott, it is imperative that Scott establish that it was awarded the ASR dealership before the Donald Edwards Company's alleged intermeddling.

Scott of sutures. This remark alone simply falls short of being substantial evidence.

Finally, the underlying significance of the ASR termination in terms of Scott's competitive position in retailing sutures is greatly diminished by the fact that Scott carried another, more successful line of sutures, Davis and Geck, after ASR eliminated Scott's access to the Lukens brand. Since Bedsole Medical Supply did not even attempt to market Lukens sutures after Scott's dealership was ended, Scott contends that Bedsole's motivation in effecting an ASR termination was simply to extinguish Scott's access to sutures generally, which are a necessary component of a hospital supply company's inventory. Without sutures, Scott contends, a supply company would be severely handicapped in competing effectively with other, more fully equipped dealers. Since Davis and Geck sutures, which Scott did have, had captured a much larger market share than Lukens, and since Bedsole never attempted to market the Lukens brand, we are left unenlightened as to what possible motivation Bedsole would have had in entering into this sort of conspiracy.

 We have diligently searched, but we cannot find any substantial evidence of a conspiracy between Bedsole and Edwards violative of section 1.[3] It is, of course, axiomatic that inferences, which Scott would have us draw, cannot stand in the face of uncontradicted and substantial evidence to the contrary. Panotex Pipe Line Co. v. Phillips Petroleum Co., 5 Cir. 1972, 457 F.2d 1279, 1289, cert. denied, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86.

### PIONEER GLOVES

The second instance of the alleged conspiracy between Bedsole and Edwards arises from the termination of the dealership which Scott briefly enjoyed with Pioneer Rubber Company, an Ohio-based manufacturer of surgical gloves which was represented by the Donald Edwards Company. In 1966, Scott Medical, desirous of making a bid on a sizable order of Pioneer gloves by a Mobile hospital, initiated contact with Pioneer to obtain surgical gloves directly from the company, after unsuccessfully attempting to obtain the products through Edwards. Pioneer responded to Scott's inquiry by dispatching a form letter notifying Scott Medical that it had been appointed a Pioneer dealer and that its order was accepted. The dealership was short-lived, however, as Pioneer sent another form letter one month later terminating the dealership before Scott could fill the hospital's purchase order. As a result of this termination, Bedsole, the next lowest bidder, received the hospital's order for Pioneer gloves which Scott otherwise would have received.

Scott argues that an inference should be drawn that Pioneer was influenced by its sales representative, Edwards, to terminate Scott's newly-awarded dealership. Edwards' interference, in turn, is impliedly attributed to Bedsole's unlawful designs on Scott's economic well-being, which Edwards acceded to in order to placate its steady customer.

Such inferences cannot prevail, however, when substantial and uncontradicted evidence to the contrary has been adduced. It is undisputed that the first form letter from Pioneer to Scott was sent while Pioneer's executive in charge of new dealership appointments was absent from the home office. Furthermore, under the company's ordinary business procedures, Pioneer routinely mailed the form letter upon receipt of an order without any decision as to dealership actually having been made, if a preliminary credit check was satisfactory. Pioneer subsequently decided to terminate the Scott arrangement since the

---

3. Scott's reliance on the fact that Bedsole eventually received a commission on certain orders for Lukens sutures obtained by Scott prior to the ASR termination simply lacks substantial probative value, inasmuch as ASR customarily billed a purchaser through its closest representative, which in this case was Bedsole.

initial appointment had been a mistake in view of the fact that Pioneer was already well-represented in the Mobile area and since adding another dealer would cause confusion among buyers, thereby harming rather than enhancing Pioneer distributorship value. Moreover, due to Scott's unfavorable credit rating from Dun & Bradstreet, Pioneer limited Scott's available credit at the outset in accepting the initial order, and it was anticipated that Scott would probably have a poor payment record with Pioneer. Finally, it was uncontradicted that no person connected with Bedsole ever contacted Pioneer or otherwise attempted to influence its decision to terminate Scott.

In addition, it was established that even after Pioneer's termination, Scott continued to market Seamless rubber gloves, which were qualitatively equal to those of Pioneer and other brands. The significance of Scott's ability to obtain and market another brand of surgical gloves is underscored by substantial evidence to the effect that the various brands of surgical gloves, of which there are many, are highly competitive with one another. Indeed, various hospitals in the Mobile area simultaneously stocked several different brands of gloves in order to accommodate the varying preferences of physicians. Consequently, what continuing benefit Bedsole would derive in blocking its competitor's access to one particular brand of surgical gloves, while undertaking no attempt to cut its supply of other, equally competitive brands, is not apparent. In sum, Scott urges us to infer an unlawful conspiracy in the face of uncontroverted evidence to the contrary. We simply cannot say that Scott's proof rose to the level of substantial evidence.

## SHAMPAINE SURGICAL TABLES

■ Scott's third complaint involves a manufacturer of surgical tables, Shampaine Industries, with whom the Donald Edwards Company had no relationship whatsoever. Since Edwards had never represented Shampaine nor was otherwise involved with this manufacturer in any way, proof of circumstances surrounding Shampaine's termination of Scott could not demonstrate the existence *vel non* of the alleged conspiracy, and such evidence was therefore inadmissible except to show Bedsole's intent or motive.

Even as to the limited inquiry into Bedsole's intent as evidenced by Shampaine's actions, the evidence is unhelpful to Scott. To prove Bedsole's unlawful designs, Scott relies on an order it obtained and placed with Shampaine which was refused by that manufacturer and thereafter filled by Bedsole. From this occurrence alone we are asked to infer an improper causal connection between Shampaine's refusal to deal with Scott and Bedsole's intent to drive its smaller competitor out of business. Once again this suggested inference which Scott would have us draw was fully rebutted by substantial evidence to the contrary. Shampaine's refusal to deal with Scott chase order resulted from credit considerations and from the fact that Shampaine already enjoyed adequate representation in the Mobile area. The decision was not influenced, nor was any attempt made to influence it, by either Bedsole or Edwards.

Finally, Scott was wholly unable to show that the actions of a locally-based franchisee in filling an order obtained by a nonfranchised supplies dealer in the same locality was in any way unusual or improper.

## OTHER EVIDENCE

Scott also relies upon several occurrences which happened over a decade ago to shed light on Bedsole's and Edwards' intent with respect to Scott. Without unduly extending this opinion, it suffices to say that the parties' dealings concerning the Lumex Company, the Pelton Crane Company, and Bedsole's gift to a local hospital were not only peripheral, but wholly failed to show conspiratorial wrongdoing or prove unlawful motive or interest.

We are of the firm view that there was a lawful basis for each of the transactions complained of by Scott Medical; that there was no conflict in substantial evidence to create a jury question; and that a directed verdict or judgment notwithstanding the verdict should have been granted. Boeing Company v. Shipman, *supra*, 411 F.2d at 374–375. The judgment of the district court is reversed and the cause is remanded with directions to enter judgment for the defendants.

Reversed and remanded with directions.