The **CROMAR COMPANY,**
Plaintiff,

v.

**NUCLEAR MATERIALS AND EQUIPMENT CORPORATION and Atlantic Richfield Company, Defendants.**

Civ. No. 74-465.

United States District Court,
M. D. Pennsylvania.

June 12, 1975.

John C. Youngman, Jr., John M. Humphrey, Candor, Youngman, Gibson & Gault, Williamsport, Pa., for plaintiff.

Clinton W. Smith, Stuart, Murphy, Hager & Smith, Williamsport, Pa., David J. Armstrong, M. Richard Dunlap, Dickie, McCamey & Chilcote, Pittsburgh, Pa., Harry W. Gill, Jr., Richard E. LaFarge, Philadelphia, Pa., for defendants.

OPINION

MUIR, District Judge.

This case was filed on June 18, 1974. It is a private, treble-damage antitrust action alleging violations of the Sherman and Clayton Acts, 15 U.S.C. §§ 1, 2 and 15. The cut-off date for discovery was May 19, 1975. The case is on the June trial list and will be reached for trial about June 17, 1975. On May 20, 1975, the Defendants, Nuclear Materials

and Equipment Corporation (NUMEC) and Atlantic Richfield Company (Arco), filed a motion for summary judgment. The Plaintiff filed its responsive brief on June 4, 1975.

## I. Background.

At all times relevant to this action, NUMEC was a wholly-owned subsidiary of Arco. In 1967, Arco created a task force to investigate the possibilities of production of a "wood-plastic composite." On April 9, 1968, the President of Arco authorized a development program for a wood-plastic composite parquet flooring branded "PermaGrain". NUMEC was responsible for production and Arco for marketing of PermaGrain. Prior to the April 9, 1968 decision authorizing a development program, Cromar had been considered by Arco and NUMEC as a possible supplier of wood for the project. The official selection of Cromar occurred in the late summer or fall of 1968. A contract, however, was not executed until March 19, 1969. The contract is nominally between Cromar and NUMEC. However, there is no dispute that Arco personnel took an active role in the pre-contractual negotiations and that Arco approved the contract before its signing by NUMEC.

Although no contract had at the time been consummated, throughout 1968 and early 1969 Cromar supplied wood fillets to the PermaGrain program for processing at the NUMEC facilities at Quehanna, Pennsylvania. Also, during the pre-contractual period, Cromar supplied other related services to NUMEC.

The contract in question provides that Cromar will supply to the PermaGrain program red oak wood fillets which meet certain specifications and called for a total production by Cromar of 12 million square feet of fillets at a yearly rate of 3 million square feet. The fillets were to undergo a several-step process. They were shipped to NUMEC's facility at Quehanna, where they were impregnated and irradiated by a special atomic process which converted them into a wood-plastic composite. They were then returned to Cromar for final assembly and finishing. In the process seven fillets were joined to make a square piece of wood with 6⅛″ sides. Four of these squares were then assembled to create what is called a finished parquet panel approximately one foot square.

The contract contained specifications, *inter alia,* which Cromar was required to meet with respect to the allowable maximum gaps between fillets in the final product. The contract provided for a quality assurance program consisting of inspections by Cromar employees followed by "over-inspection" by NUMEC personnel. Cromar's remuneration under the contract was tied to its ability to meet specifications with respect to the allowable gaps between fillets. The contract provided that NUMEC could terminate the contract if in any month more than 25% of Cromar's production failed to qualify as "prime" product. There was also an incentive to Cromar for a production of prime panels in excess of 87.3% of the monthly production.

The contract provided for changes in the basic rate to which Cromar was entitled if there were cost increases caused by NUMEC. The "start-up" date for the contract was May 1, 1969. By agreement of the parties, the date was postponed to July 1, 1969 because of late arrival of equipment at the Cromar plant.

Almost one year later, on June 18, 1970, NUMEC terminated the contract. As grounds for the termination, NUMEC cited the alleged failure of Cromar to achieve a sufficient monthly percentage yield of "prime" panels. The primary cause of this alleged low yield was gaps between fillets in excess of the contract specifications.

## II. The Motion.

In reaching its decision on the motion for summary judgment before it, the Court may refer to the pleadings, depositions, answers to interrogatories, admissions on file, affidavits, and any other material that would be admissible or

usable at trial. F.R.Civ.P. 56(c); Wright and Miller, Federal Practice and Procedure, § 2721, p. 473, n. 9. Summary judgment may be rendered only if, after a review of those documents, the Court finds that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." F.R.Civ.P 56(c). In Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), the United States Supreme Court stated that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles."

With respect to Cromar's allegation that NUMEC and Arco have violated § 1 of the Sherman Act, 15 U.S.C. § 1, the Court finds that there are genuine issues as to facts material to that contention which prevent entry of judgment in favor of NUMEC and Arco. With respect to Cromar's allegation that NUMEC and Arco attempted to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, the Court finds that there is no genuine issue as to any material fact relevant thereto that NUMEC and Arco are entitled to summary judgment in their behalf as a matter of law.

A. Sherman Act § 1 Claim.

Almost immediately after Cromar began production of panels for the PermaGrain program in July, 1969, problems and controversy developed. Arco and NUMEC contend that they voluntarily made extensive efforts to aid Cromar in meeting its requirements under the contract. They assert that, motivated by a genuine desire to have Cromar comply with the contract and by a concern for their PermaGrain program, they provided economic and technical assistance as well as personnel to Cromar beyond that called for in the contract. They maintain that they even for a short while agreed to a relaxation of specifications in order to attempt to help Cromar achieve greater production. They insist that all their activities with respect to Cromar were dictated by sound and legitimate business motives, and were designed to help Cromar maintain adequate production levels in compliance with the contract in order that the PermaGrain program might go forward. NUMEC and Arco deny any anti-competitive motives in their dealings with Cromar.

Cromar interprets the Defendants' activities in an entirely different light. For instance, it contends that Arco and NUMEC used it as a "guinea pig" for research and development purposes and intended from the outset to make Cromar's compliance impossible and to terminate the contract eventually. Cromar also contends that certain alleged actions by the Defendants, such as the arbitrary reduction of raw fillet requirements, the relaxation of specifications followed by a return to strict specifications when Cromar's yields increased, the refusal to pay certain sums of money to which Cromar was allegedly entitled, the arbitrary interpretation of the contract specifications, the intentionally improper measurement of and creation of fillet gaps, the circulation of secret memoranda concerning the program and Arco's purposes thereunder, the payment of just enough money to keep Cromar afloat for as long as it was needed, and others, all evidenced an anti-competitive motive on the part of the Defendants whose goal was to force Cromar out of business.

■ Unlike the Court in Joseph E. Seagrams and Sons, Inc. v. Hawaiian Oke and Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), cert. den., 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) which granted a motion for summary judgment by the Defendants, this Court is of the view that Cromar has presented sufficient evidence of an anti-competitive motive on the part of NUMEC and Arco to overcome their motion with respect to the Sherman Act § 1 claim.

■ The Court is not convinced that the record demonstrates with assurance that NUMEC and Arco's dealings with Cromar were solely motivated by com-

pletely legitimate business reasons. Cromar's case to the contrary is certainly not at this time overwhelming but on a motion for summary judgment any doubt as to the interpretation of evidence and as to the existence of a genuine issue of material fact is to be resolved against the movants. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971); Wright and Miller, Federal Practice and Procedure, § 2727, page 526, n. 59. Despite the Court's doubts concerning the weight of Cromar's position, Cromar has presented more than mere allegations and has created what the Court views as genuine issues as to material facts which are for the jury to resolve. Consequently, the motion for summary judgment on Cromar's Sherman Act § 1 claim will be denied.

B. Sherman Act § 2 Claim.

NUMEC and Arco claim, *inter alia,* that Cromar has no standing to sue under § 2 of the Sherman Act, 15 U.S.C. § 2. In light of its decision in Minersville Coal Company, Inc. v. Anthracite Export Association, 335 F.Supp. 360 (M.D.Pa.1971) and no change in the relevant Third Circuit law since that time, the Court will grant that aspect of the motion.

The development of the pertinent Third Circuit law which mandated this Court's holding in *Minersville Coal* began with the holding and opinion of Chief Judge Kirkpatrick in Harrison v. Paramount Pictures, Inc., 115 F.Supp. 312 (E.D.Pa.1953) which were adopted by the Court of Appeals in Harrison v. Paramount Pictures, Inc., 211 F.2d 405 (3d Cir. 1954) cert. den. 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954). In *Harrison,* the Plaintiff was a non-operating owner and lessor of a movie theatre. She was entitled as rent to a percentage of the revenues earned by her tenant, with a minimum rent regardless of the tenant's receipts. Harrison contended that an agreement between her tenant and the Defendants, a motion picture producer and a distributor, under which the theatre she owned ran "second run" rather than "first run" movies caused a diminution of the tenant's receipts and thus reduced the rent due her under the percentage clause. The tenant was not a Defendant. In denying Harrison's motion for judgment n. o. v., Chief Judge Kirkpatrick found and the Third Circuit agreed that she was not a person "injured in his business or property" within the meaning of the antitrust laws. The phrase "injured in his business or property" appears in section 4 of the Clayton Act, 15 U.S.C. § 15. It was Chief Judge Kirkpatrick's opinion that Harrison's alleged loss was beyond the limit of injuries cognizable under the antitrust laws in that her particular injuries were remote, uncertain and insubstantial, Harrison v. Paramount Pictures, at p. 317, and in that her right to a rental above the minimum, if earned, was nothing more than a hope subject to many factors other than the Defendants' conduct, p. 316.

Subsequently, in Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3d Cir. 1956), cert. den., 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956), the Court of Appeals had an opportunity to expound and expand upon the doctrine conceived in *Harrison* but did not do so. The factual background of *Melrose* is deceptively similar to that of *Harrison*. However, in marked contrast to *Harrison,* one of the Defendants in *Melrose* was the Plaintiff's tenant. Also, nothing in *Melrose* indicates that the non-operating owner there was entitled to a minimum rental regardless of receipts received by his lessee. His rent was apparently tied directly to his tenant's revenues. Despite these differences, the Court of Appeals in *Melrose* summarily affirmed the lower court's entry of summary judgment in favor of the Defendants. This opinion survived a petition for rehearing despite a dissent from the denial of the petition by Chief Judge Biggs in which he stated that the injury to the Plaintiff was direct and not remote and was therefore cognizable under § 4 of the Clayton Act. This was the only mention in *Melrose* of the "direct injury" standard apparently

created by *Harrison*. The *per curiam* opinion of the original panel did not discuss the remoteness or directness of the Plaintiff's alleged injuries.

In Minersville Coal Company v. Anthracite Export Association, *supra*, a group of corporations, partnerships, and individuals engaged in the business of mining, preparing, selling, and exporting anthracite coal charged nine defendants engaged in some phase or phases of anthracite production and distribution and known as the Anthracite Export Association with violations of the Sherman and Clayton Acts, 15 U.S.C. §§ 1, 2 and 15. The motion for summary jugdment in *Minersville* was made against only four of the Plaintiff companies whose relationship to the Defendants was that of supplier and buyer. The allegation pertinent to the claims of those four companies was that the Defendants' allegedly illegal conduct caused a diminution in the supplier's sales of raw coal to coal companies in competition with the Defendants. In support of their motions, the Defendants contended that only companies who were in a position to compete with them would have standing to sue under the antitrust laws and that any injury suffered by the four mining companies in question was remote and indirect because they were mere suppliers of the directly injured competitors. There was no allegation, as here, that the Defendant buyer-processors conspired to drive the suppliers out of business or that the Defendants engaged in any other conspiratorial anti-competitive activities which were directed at the four supplier companies. Given the holding in *Melrose*, this Court reluctantly granted the motion for summary judgment in *Minersville*. We felt that although they were significant, the alleged injuries to the coal suppliers could not honestly be said to be more direct than the alleged injuries to the non-operating lessor in *Melrose* and, consequently, the two cases could not be distinguished.

■ We felt then and continue to feel now that *Melrose* represents a restrictive interpretation of standing to sue under the antitrust laws. Although *Melrose* has been interpreted by other circuits as creating a "direct injury" test for standing, see In re Multidistrict Vehicle Air Pollution, 481 F.2d 122, 127 (9th Cir. 1973); State of Hawaii v. Standard Oil Company of California, 431 F.2d 1282, 1285 (9th Cir. 1970); Calderone Enterprises Corp. v. United Artists Theatre Circuit, 454 F.2d 1292, 1297 (2d Cir. 1971), it is hard to imagine a more direct injury than the one allegedly suffered by the Plaintiff in *Melrose*. This has the effect of creating a "competitors only" standing doctrine for antitrust actions.[1] In any case, the "direct injury" doctrine has been roundly criticized. See the dissenting opinion of Judge Waterman in Billy Baxter, Inc. v. Coca-Cola Company, 431 F.2d 183, 190 (2d Cir. 1970) and Congress Building Corporation v. Loew's, Inc., 246 F.2d 587 (7th Cir. 1957). Additionally, Congress Building Corporation v. Loew's, *supra*, singled out for particular criticism the *Harrison-Melrose* line. There is a substantial chance that given the opportunity to reconsider *Melrose*, the Court of Appeals for this Circuit would take a much less restrictive approach to standing to sue under the antitrust laws. Nevertheless, until such time as that occurs, it is our plain duty to follow *Melrose* whether we agree with it or not and, therefore, we must grant the motion for summary judgment as requested by NUMEC and Arco with respect to Cromar's Sherman Act § 2 claim. Cromar is not a competitor of Arco's or NUMEC's in the wood-plastic composite flooring market. But rather, with respect to its § 2 claim, stands in the shoes of the four Plaintiff suppliers in *Minersville*.

C. Tibbals Flooring Company.

■ The complaint also alleges that the Tibbals Flooring Company con-

---

[1]. *Harrison* and *Melrose* make no apparent distinction and *Minersville* makes no distinction between actions brought under Sherman Act § 1 and Sherman Act § 2.

spired with NUMEC and Arco in violation of § 1 of the Sherman Act. Since Tibbals is not a party to this action and since NUMEC, a wholly-owned subsidiary of Arco, can for purposes of Sherman Act § 1 conspire with its parent, Perma Life Mufflers, Inc. v. International Parts Corporation, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the inclusion of the allegation against Tibbals is superfluous. Further, Cromar admits that it has no evidence of Tibbals' participation in the alleged conspiracy. Consequently, any allegations with respect to conspiracy involving the Tibbals Flooring Company will be stricken so as to delete any reference to that company. The foregoing in no way mitigates the effect of a paragraph in the complaint which alleges conspiracy between NUMEC and Arco, notwithstanding the fact that the paragraph also alleges the participation of Tibbals.

An appropriate order will be entered.