The CROMAR COMPANY, Appellant,

v.

NUCLEAR MATERIALS AND EQUIP-MENT CORPORATION and Atlantic Richfield Company, Appellees.

No. 75–2053.

United States Court of Appeals, Third Circuit.

Argued March 26, 1976.

Decided Sept. 14, 1976.

John C. Youngman, Jr., John M. Humphrey, Candor, Youngman, Gibson & Gault, Williamsport, Pa., for appellant.

David J. Armstrong, M. Richard Dunlap, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for appellees.

Before SEITZ, Chief Judge, and ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This private antitrust suit raises two questions for our consideration. The first concerns standing to maintain a Sherman Act § 2 monopolization claim. The second involves the admissibility of evidence to establish a Sherman Act § 1 conspiracy in restraint of trade claim arising from the termination of a contract. In contrast to the district court, we conclude that the plaintiff has standing under § 2 and that the plaintiff's evidence was admissible with respect to its § 1 case. Hence, we reverse and remand for trial.

### I.

Plaintiff-appellant The Cromar Company commenced this private antitrust action against Atlantic Richfield Co. (ARCO) and its wholly owned subsidiary Nuclear Materials and Equipment Corp. (NUMEC). Cromar, a leading manufacturer of prefinished wood parquet flooring,[1] alleged Sherman

---

1. Plaintiff's product, called "Cromosaic", was a twelve inch by twelve inch tile consisting of twenty-eight small wood fillets glued to an asbestos backing. (A "fillet" is a piece of wood

Act violations arising from its contractual dealings with the defendants-appellees.

Defendants ARCO and NUMEC had undertaken a research program resulting in the development of a wood-plastic composite with properties superior to those of wood alone. This process involved impregnating wood with a liquid plastic, a monomer, and thereafter irradiating the wood, thereby converting the liquid monomer into a solid polymer. The resulting wood-plastic composite, more durable than wood, could then be used to make parquet flooring.

On March 19, 1969 Cromar entered into a contract with NUMEC which was guaranteed by ARCO. Under the contract Cromar was to convert lumber into finished wood fillets,[2] NUMEC would subject these fillets to radiation, and then Cromar was to assemble these wood-plastic fillets into parquet panels.[3] ARCO marketed this wood-plastic composite flooring under the brand name of "Perma-Grain."

On June 19, 1970 NUMEC and ARCO terminated the agreement claiming that Cromar failed to assemble parquet panels in accordance with the yield requirements of the contract. Following this termination Cromar was financially unable to continue in business. This action followed.

Cromar's amended complaint alleged that NUMEC and ARCO had engaged in conduct which violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[4] The amended complaint states:

11. During the period January 1, 1969, and June 19, 1970, and thereafter, Defendants combined and conspired among themselves . . . in restraint of trade or commerce among the several states, to force Plaintiff out of business and production of irradiated parquet wood flooring, irradiated prefinished parquet wood flooring, prefinished praquet [sic] wood flooring, praquet [sic] wood flooring, prefinished wood flooring, and wood flooring.[5]

\*    \*    \*    \*    \*    \*

13. During the period January 1, 1969, and June 19, 1970 . . . Defendants attempted to monopolize and conspired to monopolize among themselves . . . part of the trade or commerce of the several states, the production, sale and distribution of irradiated prefinished parquet wood flooring, irradiated parquet wood flooring, prefinished parquet wood flooring, parquet wood flooring, prefinished wood flooring, and wood flooring.

14. Defendants, during the period January 1, 1969, and thereafter sold irra-

---

6.125 inches long, 5/16 inch thick and a width such that when seven of them are laid side by side, a 6.125 inches piece of wood is formed. Brief for Appellees at 6 n. 3.) Cromar claimed to be one of seven manufacturers of parquet wood flooring in the United States with a capacity nearly double that of any of the other producers in 1968. Brief for Appellant at 3–4.

2. The contract called for Cromar to supply a minimum of 12,000,000 square feet of red oak wood fillets according to certain specifications with a yearly production rate of 3,000,000 square feet. Brief for Appellant at 5; Brief for Appellees at 6.

3. The finished panels were subject to elaborate specifications. If the yield of prime grade panels fell below 75% for any monthly period, NUMEC retained the right to terminate the contract. Brief for Appellant at 5; Brief for Appellees at 7.

4. Jurisdiction was based upon Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

5. Cromar's amended complaint originally alleged in paragraph 11 that the defendants conspired with Tibbals Flooring Company to restrain trade. However, the district court ordered that "[r]eferences to Tibbal's Flooring Company's participation in any alleged conspiracy in restraint of trade are stricken from the complaint" since Cromar admitted that it had no evidence of Tibbals' participation in the alleged conspiracy. 395 F.Supp. 198, 203 (M.D. Pa.1975). Cromar does not challenge that ruling here.

diated prefinished parquet wood flooring and parquet wood flooring below cost in an attempt to monopolize the portions of trade and commerce set forth in paragraph 13 supra and to eliminate competition and potential competition, including Plaintiff therefrom.

Brief for Appellees at A–3.

Following discovery the defendants NUMEC and ARCO moved for summary judgment. In an opinion and order the district court (1) denied the defendants' motion for summary judgment as to the § 1 claim; and (2) granted summary judgment as to the § 2 claim based upon Cromar's lack of standing.

The § 1 claim was then tried to a jury. Cromar's attempt to introduce evidence concerning the defendants' actions under the contract and the defendants' conduct in the wood-plastic flooring industry was not permitted. Thereafter, Cromar rested its case and the defendants moved for a directed verdict. The district court granted the motion and this appeal followed. Our jurisdiction is predicated upon 28 U.S.C. § 1291.

## II.

We initially address the summary judgment entered in favor of NUMEC and ARCO on Cromar's § 2 claim asserting monopolization.[6] The district court based its conclusion that Cromar lacked standing to sue under § 2 of the Sherman Act upon what it conceived as the settled law of this

Circuit. Relying upon our decisions in *Harrison v. Paramount Pictures, Inc.*, 115 F.Supp. 312 (E.D.Pa.1953), *aff'd* 211 F.2d 405 (3d Cir.), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954) and *Melrose Realty Co. v. Loew's Inc.*, 234 F.2d 518 (3d Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956), the district court concluded that this Court had created "a 'competitors only' standing doctrine for antitrust actions." 395 F.Supp. 198, 202 (M.D. Pa.1975). Since Cromar was "not a competitor" of either ARCO or NUMEC in the wood-plastic flooring market, the district court felt constrained to grant summary judgment in favor of the defendants on Cromar's § 2 claim. *Id.*

Thereafter Cromar moved for reconsideration of the district court's order with respect to standing under § 2 based upon this Court's decision in *International Association of Heat and Frost Insulators and Asbestos Workers v. United Contractors Assn., Inc. of Pittsburgh, Pa.*, 483 F.2d 384 (3d Cir. 1973), *amended* 494 F.2d 1353 (3d Cir. 1974). Despite language in *International Association* that cast doubt upon the district court's analysis of the issue of standing, the district court denied reconsideration based upon its view that *Harrison* and *Melrose* were still controlling. App. at 150a–152a.

Cromar argues on appeal that this Circuit abandoned the "direct injury" test of standing represented by *Harrison-Melrose* in favor of the "target area" test of *International Association*.[7] Alternatively, Cromar con-

---

6. The Sherman Act § 2, 15 U.S.C. § 2, states:

    Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

7. The Ninth Circuit described these tests of standing as follows:

    Courts adhering to the "direct injury" test focus principally on the relationship between the alleged antitrust violator and the claimant. Generally, if the claimant is separated

from the violator by an intermediate antitrust victim, standing is denied by attaching conclusory labels such as "remote", "indirect", and "consequential". Resurrecting notions of privity, this test thus arbitrarily forecloses otherwise meritorious claims simply because another antitrust victim interfaces the relationship between the claimant and the alleged violator. Moreover, the "direct injury" requirement has engendered among some adherents a regrettable tendency to deny standing to any plaintiff who happens to fall within certain talismanic rubrics: "creditor", "landlord", "lessor", "franchisor", "supplier". This disposition is, we think, unsatisfactory insofar as it transforms judicial inquiry into a mere search for labels.

    In contrast, courts employing the "target area" approach focus on claimant's relation-

tends that it may assert its claim based upon either of the two principal tests of standing articulated by the federal courts— the "direct injury" or the "target area" tests.[8]

In reply the defendants urge that the only question before this Court

> is whether a *potential* supplier of a company that operates in a particular market has standing to press a claim against its potential customer's competitor for attempting or actually monopolizing the industry, when the plaintiff concedes it did not itself compete in the relevant market.

Brief for Appellees at 13–14. Characterizing Cromar as a mere supplier of the wood-plastic flooring industry, the defendants urge that Cromar lacks standing under either the "direct injury" or "target area" tests.

### III.

◼ It is clear that "[e]very violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. . . . This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation." *Hawaii v. Standard Oil Company of California*, 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972). To ensure enforcement of the antitrust laws, Congress has provided that

> [a]ny person who shall be injured . . . by reason of anything forbidden in the antitrust laws may sue therefor in any

district court . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Clayton Act § 4, 15 U.S.C. § 15. The treble damage remedy therefore serves to encourage those "injured in their business or property by an antitrust violation . . . to serve as 'private attorneys general' " and thereby protect the public interest in vigorous competition. *Id.*

Despite the seemingly unqualified right to sue for treble damages where injury is alleged, the federal courts have been unanimous in concluding that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Company of California*, 405 U.S. at 263 n. 14, 92 S.Ct. at 892. The reason for restricting the limitless reach of the Clayton Act § 4 is clear:

> Read literally, this statute could afford relief to all persons whose injuries are causally related to an antitrust violation. Recognizing the nearly limitless possibilities of such an interpretation, however, the judiciary quickly brushed aside this construction. Instead, a measured approach has prevailed; courts have impressed a standing doctrine so as to confine the availability of section 4 relief only to those individuals whose protection is the fundamental purpose of the antitrust laws. (Footnote omitted.)

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 125 (9th Cir.),

---

ship to the area of the economy allegedly injured by the defendant.

"[T]o state a cause of action under the anti-trust laws a plaintiff must show more than that one purpose of the conspiracy was a restraint of trade and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Otherwise he is not injured 'by reason' of anything forbidden in the anti-trust laws." *Conference of Studio Unions v. Loew's Inc.*, 193 F.2d 51, 54–55 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). (Footnote omitted.)

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 127–8 (9th Cir.), cert. denied sub nom. *Morgan v. Automobile Mfgrs. Assn.*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

8. *See also Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142 (6th Cir. 1975), where the Sixth Circuit adopted as a third test of standing under the Clayton Act § 4 the test articulated in *Association of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (whether the plaintiff has alleged an injury that is arguably within the zone of interests to be protected by the antitrust laws).

cert. denied, *Morgan v. Automobile Mfgrs. Assn.,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). *See also Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.,* 454 F.2d 1292, 1295 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972).[9] Thus, the courts have circumscribed the availability of the treble damage remedy by finding in the requirement that injury be caused "by reason of anything forbidden in the antitrust laws" a threshold question of standing.

Determining in each case whether a plaintiff suing under § 4 of the Clayton Act is one "whose protection is the fundamental purpose of the antitrust laws" and therefore has standing is fraught with difficulty. By too narrowly limiting that class of plaintiffs the judiciary would be weakening the enforcement remedy created by Congress for ensuring "strong competition." On the other hand, allowing the words of § 4 to be applied literally might "result in an overkill . . . far exceeding that contemplated by Congress." *See* n. 9, *supra.*

■ Each case, therefore, must be carefully analyzed in terms of the particular factual matrix presented. In making this factual determination courts must look to, among other factors, the nature of the industry in which the alleged antitrust violation exists, the relationship of the plaintiff to the alleged violator, and the alleged effect of the antitrust violation upon the plaintiff. Then, while recognizing that breaches of the antitrust laws have effects throughout society, a court must decide whether this plaintiff is one "whose protec-

tion is the fundamental purpose of the antitrust laws." *In re Multidistrict Vehicle Air Pollution, supra* at 125.

These observations concerning the nature of standing under § 4 of the Clayton Act are derived from an analysis of earlier cases in this Circuit. This Court's first expression concerning standing came in the context of a suit brought under § 7 of the Sherman Act,[10] the predecessor of § 4 of the Clayton Act. That case, *Loeb v. Eastman Kodak Co.,* 183 F. 704 (3d Cir. 1910), involved a suit by a stockholder and creditor of the Liberty Photo Supply Company against the defendant Eastman Kodak Co. The plaintiff alleged that Kodak, by monopolistic actions, had forced Liberty Photo out of business resulting in the loss of value of plaintiff's shares and rendering worthless plaintiff's claim against the company.

This Court concluded that the plaintiff was without standing to press his § 2 Sherman Act claim. In reaching this result, this Court noted that prior to the enactment of the Sherman Act in 1890, "a stockholder in a corporation would have been without direct relief for an injury to his stock, through a wrong done to the corporation." 183 F. at 709. The question presented was whether the Sherman Act was intended to alter the existing law. This Court, in holding that it had not, reasoned as follows:

> Certainly it is not apparent that the act was intended to or did confer upon hundreds or thousands of stockholders individual rights of action when their wrongs could have been equally well and far more economically redressed by a single

---

**9.** The Second Circuit described the consequences of allowing any person suffering any injury to invoke § 4 of the Clayton Act as follows:

> . . . [I]f the flood-gates were opened to permit treble damage suits by every creditor, stockholder, employee, subcontractor, or supplier of goods and services that might be affected, the lure of a treble recovery, implemented by the availability of the class suit as facilitated by the amendment of Rule 23 F.R. C.P., would result in an over-kill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress.

454 F.2d at 1295.

**10.** § 7 of the Sherman Act, 26 Stat. 210, stated:

> Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee.

suit in the name of the corporation. Moreover, it is manifest that the plaintiff did not receive any direct injury from the alleged illegal acts of the defendant. No conspiracy or combination against him as a stockholder or creditor is alleged. The injury complained of was directed at the corporation, and not the individual stockholder. Hence any injury which he, as a stockholder, received was indirect, remote, and consequential. If a stockholder could successfully maintain such a suit, why not any creditor of the corporation? A creditor would apparently be injured in the same way and to the same extent as a stockholder, assuming that their interests were equal. Indeed, the claim demurred to assumes that both are equally injured, since the plaintiff sued not only for damages for alleged injuries to his rights as a stockholder, but also as a creditor of the Liberty Photo Supply Company.

There must exist some barrier which will effectually prevent such a multiplicity of suits as the plaintiff's position suggests, and we believe not only that that barrier exists, but that it is found now just where it was prior to the passage of the act in question.

183 F. at 709.

Admittedly, the issue of standing in *Loeb* was influenced by existing limitations upon the standing of a stockholder to sue for harm caused to the corporation. However, the factual analysis employed in *Loeb* is indicative of the process necessary to determine standing under § 4 of the Clayton Act.

The *Loeb* complaint alleged monopolization by Kodak in the photographic supply industry. Plaintiff, as a stockholder and creditor of Liberty Photo Supply, was neither a competitor of Kodak nor a member of the photographic supply industry. Moreover, the harm alleged was derivative. According standing to any stockholder or creditor of an antitrust victim would "confer upon hundreds or thousands of stockholders" and creditors individual causes of action which could be more efficiently redressed through a single suit by the corporation. Thus, the factual setting in *Loeb* strongly argued in favor of denying standing. *See also Ash v. International Business Machines, Inc.,* 353 F.2d 491 (3d Cir. 1965), cert. denied, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727 (3d Cir. 1970).

Thereafter this Court considered the standing of the owner but not the operator of a motion picture theatre to sue various motion picture distributors for allegedly conspiring to restrain trade (Sherman Act § 1) by denying first run pictures to the theatre. *Harrison v. Paramount Pictures, Inc.,* 115 F.Supp. 312 (E.D.Pa.1953), *aff'd* 211 F.2d 405 (3d Cir.) (*Per Curiam*), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954). Since this Court found itself in "complete accord with . . . [the district court's] reasoning and conclusions," we must look to the district court's opinion. 211 F.2d at 406.

The district court in *Harrison* recognized that "[i]t is not possible to formulate any general rule by which to determine what injuries are too remote to bring a plaintiff within the scope of the Act . . . . Each case must be dealt with on its own facts." 115 F.Supp. at 317. The plaintiff theatre owner asserted injury resulting from decreased receipts on the percentage rental of the theatre and depreciation in the value of the lease caused by showing second-run films. Significantly, the plaintiff had not alleged that she had any business transactions with the distributors or that she was in the business of operating motion picture theatres. Rather her economic injury stemmed from the percentage provisions of the theatre lease which only established a basis for computing rent and "did not make her a partner in the business or give her any interest in it." 115 F.Supp. at 316.

Even assuming that the plaintiff had a property interest that could be affected by the distributors' actions, the district court nevertheless concluded that her injury was too remote and indirect to afford standing. For

[t]he difficulties which would arise unless some consideration be given to the re-

moteness or indirectness of the injury are particularly apparent in the motion picture business, in which thousands of theatres are owned by persons who have nothing to do with the operation of them and no right to interfere. . . . It seems clear that unless a line is drawn excluding remote and indirect injuries to property owners in similar cases, an almost intolerable burden would be placed upon the whole industry.

115 F.Supp. at 317. Consequently the plaintiff owner was held to be without standing to sue under § 4 of the Clayton Act. *See also Melrose Realty Co., Inc. v. Loew's*, 234 F.2d 518 (3d Cir.) (*Per Curiam*), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956) (relying solely upon *Harrison v. Paramount Pictures, Inc., supra*).

These cases, based as they are upon an evaluation of all the facts involved, fail to establish a "competitors only" test of standing as the district court here concluded. They create no binding test that is determinative of standing in each particular case. Rather, *Loeb* and *Harrison* merely represent an application of the factors relevant to standing in the particular factual context presented. This is confirmed by our subsequent discussion and decision in *International Association*.

In *International Association* this Court concluded that the various unions and their members had standing to assert a Sherman Act § 1 violation against a trade association of the construction industry and a union purporting to represent employees in that industry. This result was reached without discussion of the earlier cases.[11] However, the same factual analysis that characterizes the *Loeb* and *Melrose* decisions was employed in *International Association*.

We analyzed the question of standing in *International Association* by utilizing the "target area" test expressed in various Ninth Circuit cases—whether the plaintiff was within the area of the economy endangered by a breakdown of competitive conditions.[12] However, regardless of the name given to a particular test or standard, it is evident that any "standing" analysis requires in each and every instance a weighing of, among other factors, those to which we have earlier referred.[13] See p. 506, supra.

■ Thus, we do not believe that the issue of Cromar's standing to assert its § 2 Sherman Act claim may be resolved, as the parties urge, upon our application of either one test or another. Rather, as we understand the law of this Circuit, a detailed analysis on a case by case basis of the factual context presented is required so as to preserve the effectiveness of the treble damage remedy without overextending its availability. The plaintiffs' relationship to the alleged violator of the antitrust laws—the directness or indirectness of the injury—as well as the plaintiff's position in the area of the economy threatened by the alleged anticompetitive acts are among the factors to be considered in resolving standing. No single formula captures the many

11. The prior cases in this Circuit bearing upon the issue of standing are factually inapposite. *See* pp. 506–508 *supra*.

12. *See* n. 7 *supra* and *In re Multidistrict Vehicle Air Pollution, supra; Mulvey v. Samuel Goldwyn Productions,* 433 F.2d 1073 (9th Cir. 1970); *Hoopes v. Union Oil Co.,* 374 F.2d 480 (9th Cir. 1967); *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358 (9th Cir. 1955); *Conference of Studio Unions v. Loew's Inc.,* 193 F.2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

13. The overriding importance of the facts of each case as opposed to the particular test employed is also evident in the law of other circuits. *See, e. g., In re Multidistrict Vehicle Air Pollution, supra; Mulvey v. Samuel Goldwyn Productions, supra; Hoopes v. Union Oil Co., supra; Karseal Corp. v. Richfield Oil Corp., supra; Conference of Studio Unions v. Loew's Inc., supra; Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.,* 368 F.2d 679 (8th Cir. 1966); *Jeffrey v. Southwestern Bell,* 518 F.2d 1129 (5th Cir. 1975); *South Carolina Council of Milk Producers, Inc. v. Newton,* 360 F.2d 414 (4th Cir. 1966); *Malamud v. Sinclair Oil Corp., supra; Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); *Long Island Lighting Co. v. Standard Oil Co., supra; Calderone Enterprises Corp. v. United Artists Theatre Circuit, supra.*

considerations involved in determining whether the plaintiff is one "whose protection is the fundamental purpose of the antitrust laws." *In re Multidistrict Vehicle Air Pollution, supra* at 125.

■ Turning then to Cromar's standing to assert a treble damage claim against the defendants, we must therefore examine the facts in a light most favorable to the non-moving party, Cromar. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Essentially, Cromar has alleged that the defendants sought to monopolize the sale, production, and distribution of wood-plastic tile; and that by their acts in furtherance of this objective, the defendants drove Cromar out of business.

■ The relationship between Cromar and the defendants is not disputed. It is evidenced primarily by the March 19, 1969 contract into which they entered. That contract not only provides that Cromar would process raw red oak lumber into finished wood fillets to certain specifications and at a yearly rate of 3,000,000 square feet, but it also delineates the process by which the defendants' product was to be completed. Essentially, the fillets were to be shipped by Cromar to NUMEC's plant where they were to be irradiated to form a wood-plastic composite. At that point the fillets were then returned to Cromar for final assembly and finishing. During this process the wood-plastic fillets were glued to a backing so as to form a parquet panel. Cromar was then required to sand and buff the panels. Provision was also made for inspection, packaging, storage and shipment of the panels to NUMEC customers. The contract also provided for Cromar to use its facilities and technology in the manufacture of other special types of wood-plastic products as desired by NUMEC.

As previously discussed, we must relate these facts to the criteria relevant to standing (*see* p. 506 *supra*). No one disputes the relatively small number of manufacturers of parquet flooring and of wood-plastic parquet flooring. Nor is there any dispute as to Cromar's relationship with NUMEC.

Cromar by reason of its production, assembly and finishing activities among others became an integral part of the NUMEC production process of wood-plastic flooring. Finally, Cromar's complaint, liberally read, alleged that the defendants sought to monopolize the production, sale, and distribution of wood-plastic flooring and that this result was achieved, at least in part, by their treatment of Cromar under the contract. Specifically, it is plaintiff's position that the defendants failed adequately to reimburse plaintiff for its performance in order to achieve cost savings and to sell their product below cost. In addition, plaintiff contends that defendants' wrongful termination of the contract and intentional elimination of plaintiff as a supplier of raw wood fillets enabled defendants to effectively tie up the supply of raw wood fillets necessary for the production of wood-plastic flooring. Through these illegal acts, aimed at the plaintiff, the defendants' monopolization of the wood-plastic flooring industry was achieved. Thus, based upon the uncontested facts and the allegations and theory on which plaintiff's complaint was based, Cromar is both a participant in the wood-plastic flooring industry and is directly affected by acts of the defendants which were instrumental in their alleged acquisition of monopoly power. It is therefore apparent that Cromar has standing to sue and cannot be denied the opportunity to prove, if it can, its claim against the defendants. Accordingly, we need not decide whether Cromar would have standing in its capacity other than as a producer-participant in the wood-plastic industry, for in light of its complaint that this latter aspect of its activity has been harmed by the defendants' acts, its standing under any test or analysis is evident.

Therefore, this case is not one, as the defendants would have us hold, where the plaintiff-supplier is asserting an anti-trust claim based upon its loss of the alleged violator's competitors as potential customers. *Cf. Volasco Products Co. v. Lloyd A. Fry Roofing Co.,* 308 F.2d 383 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct.

721, 9 L.Ed.2d 717 (1963). Rather, Cromar, as a producer-participant in the wood-plastic parquet flooring industry, is seeking to recover for injury resulting from the alleged § 2 violation. We conclude on the record presented that Cromar is a plaintiff whose protection is a primary purpose of the anti-trust laws and therefore the district court erred in dismissing the § 2 claim. *In re Multidistrict Vehicle Air Pollution, supra.*

#### IV.

We next turn to Cromar's Sherman Act § 1 conspiracy in restraint of trade claim.[14] Cromar predicated its claim upon the defendants' alleged breach of the Cromar-NUMEC contract and the defendants' conduct under the contract, which conduct was allegedly "motivated by anti-competitive purposes." App. at 673a. The plaintiff devoted the first days of trial to the presentation of evidence concerning the parties' contractual dealings. The defendants objected to the admission of this evidence in the absence of any proof relating to the issue of anticompetitive intent. Before ruling upon this objection, the court permitted Cromar to make an offer of proof as to the remainder of its case, so that the relevancy of the contract evidence could be ascertained.

Thereupon Cromar represented to the court that, it would introduce evidence as to the defendants' (1) breaches of contract and activities under the contract; (2) sale of PermaGrain below cost; (3) tying up the source of the wood supply; (4) responsibility in part for some competitors' inability to continue in business; (5) increase in the share of the wood-plastic market; and (6) preventing other competitors from entering the market. From this evidence Cromar argued that the anticompetitive intent necessary to establish a § 1 violation could be inferred.

The defendants renewed their objection as to each of these six categories of evidence, and the district court sustained their objections. Cromar then rested its case, and the defendants moved for a directed verdict arguing that "the present record of evidence admitted . . . fails to establish that there was a conspiracy between the defendants in restraint of trade or interstate commerce to put Cromar out of business . . . ." App. at 717a. The district court granted the defendants' motion and entered a verdict in their favor.

Cromar argues that the district court erred in excluding the proffered evidence and hence that the granting of a directed verdict was improper. Although the district could did not specify its reasons for granting the directed verdict, our reading of the record leads us to the inescapable conclusion that the district court found no evidence of the anticompetitive intent necessary to convert into an antitrust violation what might otherwise be a mere breach of contract action.[15] Thus, the question presented is whether the district court erred in excluding the evidence by which Cromar sought to establish the defendants' anticompetitive intent.

The termination of contractual relations does not in and of itself implicate the antitrust laws. *Ark Dental Supply Co. v. Cavitron Corp.,* 461 F.2d 1093 (3d Cir. 1972). It is only when such actions are "part and parcel of unlawful conduct or agreement with others or were conceived in a purpose to unreasonably restrain trade, control a

---

**14.** The Sherman Act § 1, 15 U.S.C. § 1, provides in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

**15.** As a result of this evidentiary ruling, we do not reach the defendants' arguments: (1) that the plaintiff failed to establish the jurisdictional predicate of interstate commerce or a substantial effect upon commerce; (2) that the alleged *actions did not constitute an unreasonable restraint of trade;* or (3) that the plaintiff failed to introduce any proof of damage. Since the district court was concerned exclusively with whether Cromar could introduce evidence that the defendants' actions were taken with an anticompetitive intent, these arguments are premature at this stage of the proceeding and are not properly presented for consideration on this record.

market, or monopolize, [that] such conduct might well run afoul of the Sherman Law." *Poller v. Columbia Broadcasting,* 368 U.S. at 468–69, 82 S.Ct. at 489. *See also Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquor, Ltd.,* 416 F.2d 71, 74 (9th Cir. 1969). Cromar recognized that the defendants' alleged breach of contract and their conduct under the contract would constitute a § 1 violation only if it were shown that "those actions were motivated by anticompetitive purposes . . . ." App. at 673a.

■ Cromar's offer of proof included evidence concerning the relations between the parties under the contract as well as the defendants' conduct in the wood-plastic flooring market. The alleged anticompetitive intent and purpose with which NU-MEC and ARCO terminated the contract with Cromar are not susceptible of direct proof by Cromar. *Eastern States Retail Lumber Dealers' Assoc. v. U. S.,* 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); *Harlem River Consumers Coop. Inc. v. Associated Grocers of Harlem, Inc.,* 371 F.Supp. 701, 714 (S.D.N.Y.), *aff'd* 493 F.2d 1352 (2d Cir. 1974). Intent in antitrust cases, as in all cases, is a question to be resolved by the trier of fact after consideration of all the evidence. *Cf. United States v. Cangliano,* 491 F.2d 906, 910 (2d Cir.), cert. denied, 419 U.S. 904, 95 S.Ct. 188, 42 L.Ed.2d 149 (1974). Certainly the defendants' actions under the contract with respect to Cromar are relevant to show the intent with which they terminated the contract. *Cf. Scott Medical Supply Co., Inc. v. Bedsole Surgical Supplies, Inc.,* 488 F.2d 934, 938 (5th Cir. 1974). Moreover, the defendants' actions with respect to other members of the wood-plastic flooring indus-

try and with respect to their pricing policies are also indicative of their motivations. *See Cornwell Quality Tools Co. v. C. T. S. Company,* 446 F.2d 825, 833 (9th Cir. 1971); *Belmont Industries, Inc. v. Bethlehem Steel Corp.,* 512 F.2d 434, 438 (3d Cir. 1975).

Thus the evidence offered by Cromar constituted the sole means by which it could attempt to establish the defendants' intent. The only issue presented to the district court was the admissibility of the proffered evidence. In ruling that evidence inadmissible, we conclude that the district court erred.

■ Having determined that evidence essential to Cromar's case was improperly excluded, it follows that the defendants' motion for a directed verdict should have been denied.[16] We reach this result despite the defendants' contention that they cannot be deemed to have conspired in restraint of trade as a matter of law. Relying upon *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), NUMEC and ARCO argue that a parent and its wholly owned subsidiary cannot conspire in violation of § 1 where they have not held themselves out as competitors. The record clearly establishes that NUMEC was a wholly owned subsidiary of ARCO at all times relevant to this suit and there is no evidence that the defendants held themselves out as competitors. However, we find the absence of any appearance of competition between the defendants irrelevant to their potential Sherman Act liability.

The Supreme Court has consistently stated that "common ownership and control does not liberate corporations from the impact of the antitrust laws."[17] *Kiefer-Stew-*

---

16. We express no opinion as to any renewed motion that may be made by the defendants after the improperly excluded evidence has been admitted nor do we intend to restrict or limit the district court's exercise of discretion with respect to evidentiary rulings it may be required to make during the course of the trial, when the plaintiff seeks to introduce the proffered evidence. We rule only that the subject matter of the evidence offered was relevant to the § 1 claim and accordingly should be admitted subject to the applicable rules of evidence.

17. The doctrine that a corporation and its wholly owned subsidiaries may be liable for conspiring in violation of § 1 of the Sherman Act has been subject to criticism and comment. *See, e. g.,* Handler, *Twenty-Five Years of Antitrust,* 73 Colum.L.Rev. 415, 452–53 (1973); Handler, *Through the Antitrust Looking Glass—Twenty-First Annual Antitrust Review,* 57 Calif.L.Rev. 182, 182–86 (1969); Willis and Pitofsky, *Antitrust Consequences of Using Corporate Subsidiaries,* 43 N.Y.U.L.Rev. 20 (1968); McQuade, *Conspiracy, Multicorporate Enter-*

*art Co. v. Seagram & Sons, supra,* at 215, 71 S.Ct. at 261. It is true, as the defendants urge, that this rule "is especially applicable where [the commonly owned corporations] . . . hold themselves out as competitors." *Id.* Any suggestion that *Kiefer-Stewart* imposed a qualification upon the antitrust liability of parents and wholly owned subsidiaries was dispelled by the Court's subsequent statement in *Perma Mufflers v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968). In *Perma Mufflers* the Supreme Court re-emphasized that when a parent and subsidiary avail "themselves of the privilege of doing business through separate corporations, the fact of common ownership could not save them from any of the obligations that the law imposes on separate entities."[18]

In light of this unqualified statement by the Supreme Court, we do not consider the absence of the appearance of competition between the defendants a bar to § 1 liability.[19] Therefore, the defendants' final argument in support of the directed verdict must be rejected.

## V.

Having concluded that Cromar had standing to assert a Sherman Act § 2 claim against NUMEC and ARCO and that the evidence which Cromar offered in support of its § 1 claim was erroneously excluded, we will reverse and remand to the district court for further proceedings consistent with this opinion.

prises, and Section 1 of the Sherman Act, 41 Va.L.Rev. 183 (1955); Comment, *All in the Family: When Will Internal Discussions Be Labelled Intra-Enterprise Conspiracy,* 14 Duq.L. Rev. 63 (1975).

**18.** We recognize that a statement contrary to this principle appears in *Ark Dental Supply Co. v. Cavitron Corp.,* 461 F.2d 1093, 1094–95 n. 1. (3d Cir. 1972). However we observe that: (1) *Perma Muffler,* which was the most recent Supreme Court pronouncement on this subject is not cited in *Ark Dental;* (2) note 1 in *Ark Dental* does not state the law of this Circuit but rather just acknowledges those authorities which purport to reach an opposite conclusion, and finally (3) the note in light of *Ark Dental's*

ROSENN, Circuit Judge (concurring and dissenting).

I agree with and join in the majority disposition of the monopoly issue in this case. I am constrained, however, to dissent from part IV of the majority opinion disposing of Cromar's claim for conspiracy in restraint of trade under section 1 of the Sherman Act. I would affirm the district court's judgment granting Nuclear Materials and Equipment Corporation and Atlantic Richfield Company a directed verdict as to this phase of the case pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.

I recognize the well-established principle that on a motion for a directed verdict in favor of the defendants, the plaintiff is entitled to have the evidence considered in a light most favorable to it and to have the benefit of all inferences which can be drawn reasonably from the record. So viewed, I believe the district court correctly held the evidence introduced together with the additional evidence proffered was insufficient to support a verdict of the jury that the defendants had conspired to restrain trade in terminating plaintiff's contract to convert lumber into finished wood fillets.

In addition to the evidence introduced and tendered relating to breach of contract, the district court provided the plaintiff with ever opportunity to develop the additional evidence it intended to offer to support its case. He plainly stated to counsel that if they had "something more than the breach

holding is mere dictum and thus does not control our disposition here.

**19.** *See also George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 557 (1st Cir. 1974); cert. denied 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39, 44 (5th Cir. 1974), cert. denied 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *GTE Service Corp. v. F.C.C.,* 474 F.2d 724, 733 n. 14 (2d Cir. 1973); *TV Signal Co. of Aberdeen v. American Telephone & Telegraph Co.,* 462 F.2d 1256, 1260 (8th Cir. 1972); *Tamaron Distributing Corp. v. Weiner,* 418 F.2d 137, 139 (7th Cir. 1969); *Chastain v. American Telephone & Telegraph Co.,* 401 F.Supp. 151 (D.D.C.1975).

of contract to prove that the defendants conspired to put plaintiff out of business," he was "perfectly willing to hear it." In response to this specific invitation, plaintiff's counsel responded that most of their evidence concerned breaches of contract and "activity and conduct under that contract." The only other evidence upon which it relied was the six items of proof delineated in part IV of the majority's opinion.

None of those items of proof, even if one were to extend the most generous construction in favor of Cromar, would support a claim of "contract, combination, . . . or conspiracy" in restraint of trade. Concerted action is an essential ingredient of a section 1 claim; a restraint of trade per se does not constitute a violation. *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co.*, 513 F.2d 102, 108–109 (2d Cir. 1975); *Delaware Valley Marine Supply Co. v. American Tobacco Co.*, 297 F.2d 199, 207 (3d Cir. 1961). Even if Cromar's evidence were sufficient to show an anticompetitive intent, there is a complete absence of proof as to a conspiracy on the part of ARCO and NUMEC.

I do not disagree with the majority's invocation of the *Perma Mufflers* decision and the "intra-corporate conspiracy" doctrine in this case where a parent and its wholly owned subsidiary are alleged to have conspired. I do, however, take issue with its appraisal of Cromar's evidence of the existence of such a conspiracy. The fact that one company is a subsidiary of another is not in itself evidence of concerted action sufficient to support a jury finding of conspiracy. Although proof of conspiracy can be developed by circumstantial evidence, plaintiffs "still had the burden of adducing sufficient evidence from which the jury could conclude on the basis of reasonable inferences and not mere speculation, that defendants' refusals to deal with them were the product of concerted action between them." *Venzie Corp. v. United States Mineral Products Co., Inc.*, 521 F.2d 1309, 1312 (3d Cir. 1975).

I believe the district judge was correct in granting a directed verdict on Cromar's sec-

tion 1 claim and in refusing to subject the parties to an inevitably prolonged presentation of evidence whose legal insufficiency to establish an antitrust violation was apparent.