Leonard H. TOSE et al.

v.

FIRST PENNSYLVANIA BANK et al.

Civ. A. No. 78–1499.

United States District Court,
E. D. Pennsylvania.

May 28, 1980.

Joseph L. Alioto, Alioto & Alioto, San Francisco, Cal., for Leonard Tose, The Philadelphia Eagles Football Club and Tose, Inc.

Thomas Monteverde, Monteverde, Hemphill & Maschmeyer, Philadelphia, Pa., for First Pennsylvania Bank, John R. Bunting, John C. Pemberton.

Ballard, Spahr, Andrews & Ingersoll, Tyson W. Coughlin, Philadelphia, Pa., for Prov. Nat'l Bank.

H. Francis Delone, Arthur E. Newbold, IV, Dechert, Price & Rhoads, Philadelphia Pa., for Girard Bank.

Benjamin M. Quigg, Jr., James J. Rodgers, Morgan, Lewis & Bockius, Philadelphia, Pa., for The Philadelphia National Bank.

Patrick T. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for The Chase Manhattan Bank, N. A.

Thomas B. Rutter, LTD, Philadelphia, Pa., for S. Forstater.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Leonard H. Tose, The Philadelphia Eagles Football Club and Tose, Inc., have brought this treble damages action for alleged violations of the federal antitrust laws. Plaintiffs claim that defendants, First Pennsylvania Bank, its former Chairman, John R. Bunting, its Vice Chairman, John C. Pemberton, Provident National Bank, The Chase Manhattan Bank, Girard Bank, The Philadelphia National Bank and Sidney Forstater, entered into conspiracies to unreasonably restrain trade in violation of Sections 1 and 2 of the Sherman Act. The alleged purposes of the conspiracies were: 1) to form a "banking boycott" which would deny plaintiffs access to the credit market in the Philadelphia area and 2) to fix the prime interest rate so that all defendant banks would charge a "uniform non-competitive prime rate". In addition, plaintiffs allege that the defendants' activities constitute malicious interference and conspiracy to interfere with advantageous contractual relations and business prospects under Pennsylvania law. As to the First Pennsylvania Bank defendants alone, there is an allegation that a provision of the Bank Holding Company Act Amendments of 1970, 12 U.S.C. § 1972(1)(C), has been violated.

Now before the Court are the parties' cross-motions for summary judgment and partial summary judgment. For the reasons set forth in this memorandum, I have granted the motions of defendants Girard and Chase Manhattan and entered summary judgment in their favor on all claims.[1]

---

1. On May 16, 1980, I entered an order stating my decisions on the various cross-motions for summary judgment and partial summary judgment.

Also, I have granted the motions of all defendant banks and denied the motion of plaintiffs as to Count IV, the charge that the banks have fixed the prime interest rate, and entered summary judgment in defendants' favor on that claim. I have denied, however, the motions for summary judgment and partial summary judgment of all defendants, except Girard and Chase Manhattan, as they apply to Count I, the banking boycott, Count III, the pendent state tort claims, and Count II, the Bank Holding Act claim which applies only to the First Pennsylvania Bank defendants.

## I. FACTUAL HISTORY

The factual history of this litigation is rather involved; however, I will summarize the events as briefly as possible. The present dispute between Leonard Tose (Tose) and the defendants dates back to 1969 when defendant First Pennsylvania Bank (FPB) loaned Mr. Tose ten million five hundred thousand dollars ($10,500,000) so that he could buy the Philadelphia Eagles Football Club (Eagles).[2] In addition to the money advanced by FPB, a group of investors loaned some four million dollars ($4,000,000) to Tose to help finance his purchase of the Eagles. Tose acquired the assets of the football club in his name and then transferred them to a limited partnership. Under the terms of this partnership agreement, Tose was to be the sole general partner and the various individual investors who had loaned Tose $4,000,000 were to be limited partners. (RA # 2, Exh. 3)

The Eagles Partnership formed by Tose soon encountered problems. First, several of the investors rejected the limited partnership proposal and brought suit in the Court of Common Pleas of Philadelphia County against Tose claiming that they had lent the money with the understanding that they would become general partners. Al-

though the Court rejected their claims in 1972, Tose borrowed an additional $2,678,-000 from FPB in order to repay the disgruntled investors.

In 1973, investor/limited partner Solomon Katz requested Tose to return his investment. In order to repay Katz, Tose borrowed $1,240,000 from Herbert Barness, another limited partner in the Eagles, and as forgiveness of the loan, Barness received Katz's share in the Eagles Partnership. On or about July 16, 1973, Tose and Barness executed an agreement whereby each agreed to purchase the interest of the other for the amount of their original investment should one die, retire, go bankrupt or be adjudicated insane or incompetent. (RA # 2, Exh. 9)

By the end of 1974, the Eagles limited partnership consisted of Tose, as sole general partner, Barness, Anne Firestone, as the Executrix of the Estate of Roger Firestone, John Firestone and Walter Leventhal. (RA # 2, Exh. 38). In October of 1975, Tose purchased the Firestone Estate's 9.813% limited partnership interest; his offer to buy John Firestone's 6% share was rejected because Firestone thought the offering price was inadequate. (RA # 2, Exh. 41)

Also, by the end of the 1974 season, due to such factors as high interest rates, a players' strike, a poor pre-season attendance, the Eagles had a negative cash flow.[3] As a result of these financial problems, the Eagles could not make their June 30, 1974 amortization payment of $750,000 to FPB. Accordingly, on November 1, 1975, Amendment No. 1 was added to the Eagles Restated Loan Agreement with FPB. (RA # 2, Exh. 44) This provision adjusted the amortization schedule and set $60,000 as the maximum amount of money which Tose could take from the Eagles as salary and

---

2. Requests for Admission by Plaintiffs # 2 of FPB defendants (RA # 2), Exh. 2.

3. Gerald Hayes, the FPB loan officer supervising the Eagles account, noted in an internal

memorandum that Tose's extravagant manner of operating the club contributed to the Eagles' financial woes. (RA # 2, Exh. 40)

expenses during unprofitable years.[4] Also, in June of 1976, Tose and Barness entered into another agreement which included, *inter alia*, provisions giving each man the right of first refusal should the other decide to sell his interest in the Eagles.

During 1976, relations among the remaining members of the Eagles partnership soured. After much wrangling, in December of 1976, Tose and Firestone were finally able to agree on terms for the sale of the Firestone interest to Tose. By the end of that year, Barness, for reasons which are in dispute, wanted to sell his approximate 29% share of the partnership. Moreover, when the Comptroller of the Currency reviewed the loan portfolio of FPB at the end of December, 1976, he graded the bank's loan to the Eagles as "substandard".

FPB contends that as a result of this poor rating, during the early part of 1977, FPB began to reassess its loan to Tose and the Eagles.[5] In March of 1977, Gerald Hayes, the supervising loan officer, wrote two memoranda, one to Cameron S. Clark, Executive Vice President, and one to John R. Bunting, then Chairman of FPB, recommending changes in the loan agreement with Tose. (RA # 2, Exhs. 134, 141). One of Hayes' suggestions was that Tose be required to give up financial control of the Eagles. However, in a meeting attended by Hayes, Bunting, Tose and his lawyer, Edwin Rome, on March 25, 1977, FPB took a much softer line. Although Bunting got Tose to agree to the need for tighter control of expenditures by the Eagles, he also responded favorably to Tose's suggestion that FPB loan additional funds to Tose so that he could purchase Barness' share in the football club. (Rome deposition, 7/14/78, p. 38–41). Also, during March of 1977, Firestone, claiming that Tose had defaulted on their Agreement of Sale and Security Agreement, invoked the acceleration clause and demanded payment in full for his interest in the Eagles. (RA # 2, Exhs. 138–145).

Throughout the spring and early summer of 1977, FPB and Tose continued to negotiate regarding reorganization of the management of the Eagles as well as about the additional loan to Tose.

Although the parties dispute who and what caused the breakdown, negotiations between Tose and FPB had ceased by July 22, 1977. (RA # 2, Exh. 258). The plaintiffs and FPB defendants also give differing accounts of a meeting attended by Tose, Rome, Bunting and Pemberton which took place on July 28, 1977. Plaintiffs maintain that Bunting and Pemberton called FPB's six million dollar loan to the Eagles, giving Tose approximately sixteen hours to come up with alternative financing. Also, they claim that Bunting stated that he would make sure that no Pennsylvania bank would provide this financing. The FPB defendants deny making such threats. It is undisputed, however, that on July 29, 1977, FPB made Sidney Forstater, another defendant in this case, the Chief Financial Officer of the Eagles. (RA # 2, Exh. 265). Forstater's management of the club lasted until August 10, 1977, when Tose was able to obtain a six month "bridge loan" from a Detroit bank so he could pay off the FPB loan.

## II. ANALYSIS

### A. COUNT I—THE CONSPIRACY TO ENGAGE IN A BANKING BOYCOTT

All of the defendants have moved for summary judgment on Count I of the Amended Complaint which states that defendants, in violation of Section 1 and 2 of the Sherman Act, conspired and combined to unreasonably restrain trade by forming a banking boycott of the plaintiffs. In support of their motion on the boycott issue, defendants make two principal arguments. First, they assert that the plaintiffs have

---

**4.** The Amendment also granted Tose certain additional benefits for the periods when the Eagles were making a profit.

**5.** An audit of the Eagles' books for 1976 revealed that as of the end of that year the Eagles

were in default of certain provisions of the FPB loan. FPB, upon request, waived these defaults. (RA # 2, Exh. 159.) The events of default did not include delinquency of payment of principal and/or interest.

failed to adduce, as they must to defeat summary judgment, "significant probative evidence" that any conspiracy existed. Secondly, even assuming that the evidence of a conspiracy is sufficient to overcome the motion for summary judgment, defendants urge that the plaintiffs have not alleged facts nor developed evidence that would establish that the conspiracy resulted in an unreasonable restraint of trade as is necessary to maintain a cause of action under Sherman § 1. In response to these arguments, plaintiffs state that they have indeed produced evidence of a conspiracy sufficient to overcome summary judgment and that they need not show that defendants' actions have resulted in an anticompetitive effect because this case involves a *per se* violation of the Sherman Act.

■ It is settled that summary judgment should be used sparingly in complex antitrust cases involving questions of motive and intent. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Moreover, since direct proof of a conspiracy is rare, a plaintiff attempting to prove a conspiracy in violation of the Sherman Act must usually rely on the inferences that can be drawn from circumstantial evidence. *Milgram v. Loew's Inc.*, 192 F.2d 579, 583 (3d Cir. 1951). At the summary judgment stage, I must determine whether or not the record provides evidence from which an inference of conspiracy could reasonably be drawn. *Lamb's Patio Theatre v. Universal Film Exchanges*, 582 F.2d 1068, 1069 (7th Cir. 1978). Summary judgment is appropriate in those antitrust cases where plaintiffs, after having engaged in significant discovery, fail to produce "significant probative evidence" in support of the allegations in their complaint. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 389–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 579 (3d Cir. 1979). With these legal standards in mind,

I turn now to an analysis of plaintiffs' case against each of the defendants for a conspiracy to carry out a "banking boycott".

*Chase Manhattan and Girard Bank*

■ Plaintiffs have engaged in a considerable amount of discovery; they have deposed all of the important potential witnesses as well as filed numerous interrogatories and requests for document production.[6] Despite this extensive discovery process, plaintiffs have failed to adduce evidence sufficient to support a reasonable inference that Chase Manhattan Bank or Girard Bank conspired with the other defendants to boycott plaintiffs by refusing to extend them credit.

The present record shows that Chase Manhattan has had very limited contacts with plaintiffs. In November of 1977, Lincoln Bank of Bala Cynwyd, Pennsylvania, asked Chase to consider participating in a loan to the Eagles and Leonard Tose. (Affidavit of Thomas Reifenheiser, ¶ 2). Representatives of Chase met with the Chairman of Lincoln Bank, Tose and his lawyer, Edwin P. Rome, on November 22, 1977 and again on November 28, 1977 to discuss provisions of the proposed loan. (Reifenheiser Affidavit, ¶ 2 and Reifenheiser Deposition at 43) During a third meeting on December 8, 1977, representatives from Chase, Lincoln and the Eagles shook hands and toasted with champagne a prospective agreement under which the two banks jointly would loan $7,000,000 to the football club and $1,725,000 to Tose. (Reifenheiser Deposition Exh. 10). Although the parties disagree about the significance of this handshake and toast, it is clear that no formal agreement on the loan had been reached.

On that same day, December 8, 1977, Chase requested its New York lawyers, the firm of Milbank, Tweed, Hadley and McCloy (Milbank) to review the legal aspects of the proposed Eagles/Tose loan. After reviewing the suggested terms of the

---

**6.** The parties have been permitted practically unlimited discovery, and none contends that additional discovery is needed.

proposed loan and security as well as the Eagles Partnership Agreement and the pending litigation against Tose by limited partners Barness and Firestone, the Milbank lawyers advised Chase not to make the loan because in their view Tose and the Eagles could not offer sufficient security. On December 27, 1977, Reifenheiser notified both Lincoln and Tose's attorney that it would not participate in the loan. (Reifenheiser Affidavit, ¶ 10).

Plaintiffs have uncovered almost no evidence of contacts between Chase and any of the alleged co-conspirators in this case. The present record reveals only one such communication occurring before December 27, 1977, the date when Chase formally rejected the request to participate in a loan to Tose and his football club. On December 9, 1977, an employee of Chase's credit department called the First Pennsylvania bank, where Tose and the Eagles had done their banking since 1969, to make a routine credit inquiry. The Chase employee reported in a memorandum that a Mrs. Wilson of FPB had told him that FPB no longer dealt with Mr. Tose and referred to "published information" as providing an explanation for the bank's termination of relations with Tose. (Reifenheiser Affidavit, Exh. C).

There is evidence that *subsequent* to Chase's formal rejection of participation in a loan to plaintiffs, Herbert Barness, an alleged co-conspirator who is not now a defendant in this case, wrote a letter to a Senior Vice-President of Chase, Peter E. Lengyel, stating that he had an agreement with Tose which gave him a right of first refusal as to Tose's interest in the Eagles (Reifenheiser Affidavit, Exh. D). Thus, plaintiffs can point to only two contacts between Chase and any of the other purported co-conspirators, and one of these communications occurred after Chase formally had declined to make a loan to Tose and his football club. This evidence of two limited contacts is insufficient to support an inference that Chase joined the alleged conspiracy.

The evidence linking Girard Bank to a conspiracy to impose a banking boycott of the plaintiffs is even more tenuous. In September of 1977, James Duffy, an accountant for Leonard Tose, asked Peter Viera, a loan officer for Girard, if the bank would be interested in making a loan to Tose or the Eagles. Viera conveyed this request to Walton St. Clair, an Executive Vice President of Girard; St. Clair told Viera to tell Duffy that the bank would not be interested in such an arrangement because of Tose's reputation. (St. Clair deposition at 6–7, Girard's Memorandum in Support of Summary Judgment, Exh. C). Girard was approached a second time on the question of making a loan to plaintiffs; the president of a St. Louis bank telephoned William Eagleson, the President of Girard, to ask if Girard would be interested in participating in a loan to the Eagles. Although St. Clair told this bank that it had previously declined to make such a loan, as a courtesy to it as a correspondent bank, Girard would be willing to consider the participation proposed by the St. Louis Bank. (St. Clair deposition at 9–10). After Eagleson and St. Clair discussed the matter again, however, they decided to and did tell the St. Louis bank they did not want to participate in a loan to the Eagles.

In January or February of 1978, Girard was approached for a third time about financing the Eagles. Mr. Duffy asked Mr. Viera if people from Girard would meet with him to discuss a loan. (St. Clair Deposition at 29). St. Clair agreed to such a meeting and at a luncheon attended by Viera, St. Clair and others, held in early February, 1978, Duffy proposed that Girard participate with First National City Bank of New York in a $5,000,000 loan to the Eagles. After this meeting, St. Clair discussed the proposal with several other officers of Girard who all counselled against the venture. After thinking about the matter over a weekend, St. Clair told City Bank that Girard would not participate in the Eagles loan. Plaintiffs have not come forward with any evidence that Girard spoke to any of the alleged co-conspirators in this case regarding its consideration of such a loan.

Based on the present record, I conclude that plaintiffs have failed to produce evidence from which a jury reasonably could infer that defendants Chase Manhattan and Girard participated in a conspiracy to deny Tose and the Eagles access to the credit market in Philadelphia and thus take control of the football club from him. Plaintiffs argue that the evidence regarding Chase and Girard would sustain an inference of conspiracy because it shows that they acted in conformity with the other defendants when they refused to extend credit to Tose and the Eagles and this refusal was against their own financial best interests. I do not share plaintiffs' view of either the relevant law or of the facts presented by this case.

■ In *Venzie Corp. v. United States Mineral Prod. Co., Inc.*,[7] the Third Circuit held that the existence of a conspiracy to boycott or to engage in a concerted refusal to deal cannot be inferred from the mere fact of consciously parallel business behavior. There must also be a showing of 1) acts by defendants in contradiction of their own economic interests and 2) a motivation to enter an agreement. 521 F.2d at 1314–15. In the present case, although the defendant banks all declined to loan money to the plaintiffs after August of 1977, there is no evidence that Chase and Girard were aware that other lending institutions also were refusing the Eagles' requests for financing. More importantly, the evidence does not establish that Chase and Girard acted in contradiction of their economic interests by refusing to extend credit to Tose and/or the Eagles nor does it show that they had a motive to join any boycott against plaintiffs. Given the undisputed evidence of problems Tose was having with some of the limited partners as well as the

financial difficulties the Eagles were allegedly experiencing in 1976 and 1977, a refusal to participate in a multimillion dollar loan to plaintiffs, standing alone, would not support an inference that the refusal was against the banks' financial best interests. Also, plaintiffs have not shown that either Chase or Girard had any economic or personal reason to want to force Leonard Tose to give up control of the club. Thus, I reject plaintiffs' contention that the failure of Chase and Girard to make a loan to the Eagles is in itself sufficient evidence connecting these banks to the alleged boycott.[8]

*The FPB defendants, Philadelphia National Bank (PNB), Provident Bank and Sidney B. Forstater*

■ As to the other defendants, FPB, John Bunting, John Pemberton, PNB, Provident and Sidney Forstater, I find that plaintiffs have identified evidence from which a jury reasonably could infer that they engaged in a conspiracy to form a banking boycott as alleged in the Amended Complaint. In the case of each of these defendants, there is some evidence that they discussed with other alleged co-conspirators their decisions not to extend credit to Leonard Tose or the Eagles.[9] Therefore, summary judgment on Count I cannot be granted in favor of the remaining defendants on the basis that plaintiffs failed to produce significant evidence of a conspiracy.

PNB, in its memorandum in support of a motion for partial summary judgment joined in by the other defendants, has argued that even if the plaintiffs could prove that defendants had participated in the conspiracy described in Count I, there would be no violation of the Sherman Act because

---

7. 521 F.2d 1309 (3d Cir. 1975).

8. I recognize, of course, that the other banks also maintain that their refusals to make a loan to Tose and/or the Eagles were the result of independent and legitimate business judgment.

9. Sidney Forstater, unlike the other defendants is not a lending institution or an official of such an institution. According to the Amended Complaint, Forstater's role in the conspiracy was to join with Bunting and Pemberton to use FPB's loan arrangement with the Eagles to force Tose to give up control of the Football club. After Tose defaulted on the FPB loan, FPB made Forstater Chief Financial Officer of the Eagles. It is Forstater's close association with the FPB defendants which provides evidence from which his participation in the conspiracy may be inferred.

there is no allegation or proof that this conduct produced an anticompetitive effect on the relevant markets, identified in the Amended Complaint as banking and professional football. Plaintiffs point out that the antitrust laws were not designed to remedy all economic harms but rather to prevent business practices which have an adverse impact on competitive conditions of the market.

■ Citing the Supreme Court's decisions in *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) and *Fashion Originators Guild of America, Inc. (FOGA) v. F. T. C.*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), plaintiffs urge that the alleged banking boycott constitutes a group boycott and thus is a *per se* violation of the Sherman Act. When a business practice has been classified as a *per se* violation, the plaintiff need not prove that it has had an anticompetitive effect. The Supreme Court has described *per se* violations as ". . . agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

It is true that the Supreme Court has found group boycotts to be *per se* violations. However, as several lower federal courts have observed, not every case involving concerted activities is a group boycott within the meaning of the *Klor's* and *FOGA* cases, *supra*. The Third Circuit, quoting *Worthen Bank & Trust Co. v. National Bank Americard, Inc.*,[10] has noted:

> The term "group boycott" . . . is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the "group boycott" and "*per se*" labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed.

*DeFilippo v. Ford Motor Co.*, 516 F.2d 1313, 1317–18 (3d Cir. 1975), *cert. denied*, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975).[11] Moreover, the standard of analysis usually applied in cases involving claims of Sherman Act violations is the "rule of reason," which requires that plaintiff show that the disputed business practice has resulted in an unreasonable restraint of competition. *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 50 L.Ed.2d 176 (1977).

In the case now before the Court, the existing evidentiary record has not been sufficiently developed to permit me to determine whether the conduct complained of in Count I should be treated as a *per se* violation or as a violation to be analyzed under the "rule of reason". Therefore, I must reject defendants' contention that they are entitled to judgment as a matter of law on the ground that plaintiffs have not alleged or proved that the conspiracy described in Count I has produced an anticompetitive effect or an unreasonable restraint of trade.

■ By PNB's motion for partial summary judgment, defendants also raise claims regarding damages and standing. Relying principally on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), defendants urge that with the exception of the $308,155.99 sought for legal, accounting and financing fees incurred when Tose and the Eagles were required to find refinancing, the damages set forth in Count I must be dismissed because they do not represent antitrust injuries.[12] Having reviewed the evidence, I

---

**10.** 485 F.2d 119, 125 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974).

**11.** *See also, E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178, 186–87 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

*Ackerman-Chillingworth v. Pacific Electrical Contractors Assoc.*, 405 F.Supp. 99 (D. Hawaii 1975).

**12.** *Pueblo Bowl-O-Matic, supra*, involved a treble damages action challenging several mergers which allegedly violated Section 7 of the Clayton Act. Finding that the mergers had actually

find that the record concerning the issue of damages is incomplete, and material facts remain in dispute. Consequently, I must reject defendants' argument that they are entitled to summary judgment on the damage question.

Defendants also argue that both Leonard Tose and Tose, Inc. lack standing to bring this suit under Section 4 of the Clayton Act. It is alleged that Tose does not have standing because 1) he has not suffered an injury by reason of anything forbidden in the antitrust laws and 2) he is a partner, who like a shareholder, is not among those persons protected by the antitrust laws. I am not persuaded by the defendants' analysis.

■ As the Third Circuit noted in *Cromar Co. v. Nuclear Materials & Equipment Co.*, 543 F.2d 501 (1976), questions of standing in Clayton § 4 cases are complex, and each case "must be carefully analyzed in terms of the factual matrix presented." 543 F.2d at 506. Some of the factors to be considered in determining whether a party has standing to bring a treble damages action are: 1) the nature of the industry in which the alleged antitrust violation exists, 2) the relationship of the plaintiff to the alleged violator and 3) the alleged effect of the antitrust violation upon the plaintiff. *Id.*

■ Viewing this case in light of the principles set forth in *Cromar, supra*, I find that defendants are not entitled to summary judgment on the basis that Tose and Tose, Inc. do not have standing. Count I alleges that the conspiracy was directed at both Tose and the Eagles. Indeed, plaintiffs have enumerated five alleged acts by the defendants which they describe as "elements" of the conspiracy to boycott; of these, four involve harms directed at Tose personally. Also, Count I contends that as a result of the conspiracy Tose, Inc., a corporation wholly owned by Tose until June of 1979, was unable to obtain financing and the value of its shares diminished accordingly.

### B. COUNT II—VIOLATION OF THE BANK HOLDING COMPANY ACT AMENDMENT OF 1970.

Count II alleges a cause of action under the Bank Holding Company Act Amendments of 1970, 12 U.S.C. § 1972(1)(C), against the three FPB defendants: the Bank, John R. Bunting and John C. Pemberton. Section 1972(1)(C) prohibits a bank from conditioning the extension or continuation of credit on the requirement "that the customer provide some additional credit, property or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit or trust service." FPB's argument in support of its request for summary judgment on Count II is not a convincing one. According to the FPB defendants, plaintiff's Bank Holding Act claim is premised on a Fifth Circuit decision, *Swerdloff v. Miami National Bank*, 584 F.2d 54 (1978). However, there is nothing in the Amended Complaint or in other papers submitted by plaintiffs to suggest that they have grounded their § 1972(1)(C) claim on the principles set forth in *Swerdloff, supra*.

■ Although there is a dearth of cases dealing with 12 U.S.C. § 1972, the legislative history shows that the statute was designed to supplement the antitrust laws and to prohibit certain tying arrangements by banks and bank holding companies. *Hometowne Builders, Inc. v. Atlantic National Bank*, 477 F.Supp. 717, 719 (E.D. Va.1979). Plaintiffs allege that the FPB defendants "tied" the continuance of its $6,000,000 loan to them on conditions usually not required of the Bank's customers. Contrary to the defendants' assertions, these allegations state a cause of action under § 1972(1)(C). As the record now stands, it cannot be said that plaintiffs could not prove a § 1972 violation; consequently, defendants are not entitled to summary judgment on Count II.

stimulated competition because they kept some bowling alleys in business that would have failed, the Supreme Court reversed the findings of the Court of Appeals as well as the jury's verdict in favor of plaintiffs.

## C. COUNT III—PENDENT STATE TORT CLAIMS

█ Count III asserts two pendent state tort claims against the defendants. It is alleged that they have engaged in a malicious interference and conspiracy to interfere with plaintiffs' advantageous contractual relations and with their advantageous business prospects. The factual allegations upon which these claims are based are those set forth in Count I concerning the conspiracy to boycott. Under Pennsylvania law, in order to prevail in a tort action for interference with prospective contractual relations, a plaintiff must show 1) existence of a prospective contractual relation, 2) the purpose or intent to harm plaintiff by preventing the relationship from occurring, 3) the absence of privilege of justification on the part of the actor and 4) the occurrence of actual harm or damage to plaintiff as a result of the actor's conduct. *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971).

█ I have already concluded that plaintiffs have not adduced evidence from which a jury reasonably could infer that defendants Chase Manhattan Bank and Girard Bank have participated in the conspiracy described in Count I, and since plaintiffs have not alleged nor do they have evidence to prove additional facts that would support a finding that Chase and Girard have interfered or conspired to interfere with plaintiffs' contractual or prospective business relations, I will grant summary judgment on Count III in their favor. As to the other defendants, however, I find there is evidence in the present record from which a factfinder could conclude that these defendants did intentionally interfere with the prospective contractual relations of Tose and the Eagles in their efforts to find financing and that plaintiffs suffered harm as a result of this interference. Consequently, since the remaining defendants are not entitled to judgment on Count III as a matter of law, I will deny the motions of FPB, Bunting, Pemberton, Forstater, PNB and Provident for summary judgment on the state law claims.

## D. COUNT IV—CONSPIRACY TO FIX INTEREST RATES

Count IV of the Amended Complaint charges that since 1969 the defendants, with the exception of Sidney Forstater, in violation of Sections 1 and 2 of the Sherman Act, have conspired to fix interest rates in the four Pennsylvania counties of Philadelphia, Bucks, Delaware and Montgomery. Alleging that no genuine issue as to any material fact exists, both the plaintiffs and the defendants have moved for summary judgment on this count. I agree with their assessment; the evidence on this issue is complete, and no genuine issue of fact remains in dispute.

Plaintiffs' arguments in support of the claim that they are entitled to judgment on the interest fixing claim as a matter of law change somewhat from one brief to the next. Nonetheless, their principal contention appears to be that the evidence shows that the defendant banks have "tampered" with the structure of the prime interest rates of the banking industry in the Philadelphia area and thus have committed a *per se* violation of the Sherman Act.

To buttress their claim that the defendants have fixed their prime rates and thereby stabilized the rate of all Philadelphia area banks, the plaintiffs point to the following evidence of record: 1) since 1969 the prime interest rates of the defendants have tended to fluctuate in a similar pattern and to remain uniform; 2) the executive officers of the defendant banks have had the opportunity to conspire because they sit on the executive committees of other Pennsylvania financial institutions as well as frequently meet through trade associations; and 3) the defendant banks have participated in some joint loan agreements in which they have agreed that all participating banks in the particular joint venture are to charge the interest rate set by one bank.

Plaintiffs cite *United States v. Socony-Vacuum Oil Co. Inc.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) and *United States v. Container Corp.*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), two seminal

decisions concerning price fixing, as the legal authority controlling the prime rate issue in this case. It is their argument that the joint loan agreements constitute a *per se* "naked price restraint" within the meaning of the *Socony* and *Container* cases, *supra*. Although they did not have a participation loan from any of the defendant banks during the period relevant to this lawsuit, plaintiffs allege that the existence of the joint loans, with clauses agreeing to charge a single rate, affected the interest rates of all loans granted by banks in the Philadelphia area and therefore had an anticompetitive effect on the entire lending market.

The defendant banks do not dispute that their prime rates have tended to be uniform; nonetheless, they deny that they have ever agreed with any other lending institution to the establishment of their prime rate. Defendants attribute the uniformity of interest rates to the fact that money is fungible and economic forces usually compel competitors to sell a fungible product at the same price. In addition, defendants assert that joint or participation loans, which are authorized by statute in Pennsylvania,[13] do not violate the antitrust laws.[14] The principal arguments advanced by defendants in support of their claims that they are entitled as a matter of law to summary judgment on Count IV are that the evidence does not establish the existence of a conspiracy to fix prime rates and the joint loan is not a *per se* violation of the antitrust laws because it increases the availability of credit.

■ After considering the facts of this case as well as the relevant case law, I grant summary judgment in favor of the defendants on Count IV of the Amended Complaint. Plaintiffs concede that there is no direct evidence of an express agreement among the defendant banks to establish a uniform prime rate.[15] Thus, in order to establish a conspiracy, plaintiffs must rely on the inferences to be drawn from the undisputed facts of similar prime rates, the opportunity to conspire and the existence of certain participation loans which include agreements to charge a single interest rate. The fact that the prime rates of defendant banks have tended to be uniform and the fact that the banks have had the opportunity to meet and conspire is not enough evidence to sustain an inference that a conspiracy existed and plaintiffs apparently concede as much.[16]

Plaintiffs' theory that they are entitled to summary judgment on Count IV is premised on the notion that the joint loan agreements entered into by the defendant banks are *per se* violations of the Sherman Act. As I noted previously in this memorandum, if a Sherman Act case involves one of those business practices which have been classified by the courts as a *per se* violation, the plaintiff does not have to prove the challenged conduct has had an anticompetitive effect on the relevant market. In the present case, plaintiffs maintain that the provisions of the joint loan agreements requiring a bank to adopt the prime rate of a

**13.** 7 P.S. § 305.

**14.** There are two types of joint or participation loans. In a "true participation" loan, each bank is sold a share in the credit extended by the lead bank and must take the interest rate set. In a "syndicating" loan, each participating bank agrees that the interest rate of the lead bank or the prime of a non-participating bank will control. See Reply Memorandum of PNB (to plaintiffs' supplemental memorandum in opposition to defendants' motion for summary judgment pp. 4–51).

**15.** One of the briefs submitted by plaintiffs states:
> The factual thrust of plaintiffs' argument is not that there was an express agreement to

fix the prime rate on single as against joint loans, but that the express written agreements on so many joint loans, involving billions of dollars on a constantly revolving basis over all of the years of the Eagles-Tose loan (1969–77) with reciprocal provisions to follow-the-leader on prime rate constituted a 'tampering' with the prime rate on single loans within the meaning of these Supreme Court cases, and hence a *per se* violation of Section 1 of the Sherman Act. (Plaintiffs' Supplemental Memorandum in Opposition to Defendants' Motions for Summary Judgment, pp. 4–5.)

**16.** See n. 15, *infra*.

258

competitor constitute price fixing, which is a *per se* violation.

■ I cannot accept this characterization of participation loans. Although it is true that price fixing is among those concerted activities that the Supreme Court has found to fall within the *per se* category, the Court has not labelled every agreement among competitors to set the price of a good or service as price fixing. *See United States v. Addyston Pipe & Steel Co.*, 85 F.2d 271, 280 (6th Cir. 1898), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). In a recent opinion, *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court expressed its reluctance to characterize a business activity as *per se* price fixing. In that case, the Court, reversing the decision of the Second Circuit, declined to find the defendants' issuance of a blanket license granting the purchaser a nonexclusive right to perform any of the songs found in their repertoire for a fixed annual fee to be price fixing within the meaning of the Sherman Act. The decision in *Broadcast Music* was based on two principles: 1) the courts will classify a business relationship as a *per se* violation only after considerable experience with the practice [17] and 2) the *per se* classification only applies to business conduct which is plainly anticompetitive. The Supreme Court stated the following test for determining whether a practice should be categorized as a *per se* violation:

> In characterizing this conduct under the *per se* rule, our inquiry must focus on whether the effect, and, here because it tends to show effect, the purpose of the practice is to threaten the proper operation of our predominantly free-market economy—that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more rather than less, competitive.'

17. *See United States v. Topco Associates, Inc.*, 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31

441 U.S. at 19–20, 99 S.Ct. at 1553. (footnotes and citations omitted).

Since the practice of banks entering into a joint or participation loan agreement at a set interest rate is not one which has been scrutinized by the courts, it would not be appropriate to automatically classify the practice as a *per se* violation of the Sherman Act. Moreover, the participation loan is not plainly anticompetitive. Indeed, it is urged as an acceptable practice which increases the availability of credit because most large loans would not be possible if banks were not able to extend joint credit.

Since plaintiffs have relied solely on a *per se* violation theory as to Count IV and have not adduced any evidence at this summary judgment stage or suggested they will be able to produce such evidence at trial to support their claim under a rule of reason analysis, I will deny their motion for partial summary judgment and grant summary judgment in favor of all of the defendants. A copy of my order of May 16, 1980 is attached to this memorandum.